UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

The General Retirement System
of the City of Detroit, *et al.*,

      Plaintiffs,

v.                                                Case No. 11-11686

Richard D. Snyder, in his official         Honorable Sean F. Cox
capacity of Governor of the State of
Michigan, *et al.*,

      Defendants.
_____/

## OPINION & ORDER
## GRANTING DEFENDANTS' MOTION TO DISMISS AND
## DENYING DEFENDANTS' MOTION FOR RULE 11 SANCTIONS

In this action, Plaintiffs ask this Court to declare one section of the Local Government and School District Fiscal Accountability Act, Public Act 4 of 2011, M.C.L. § 151.1501 *et seq.* unconstitutional and enjoin its implementation. Specifically, Plaintiffs "challenge one particular provision of the Act that applies solely to the pension funds and retirement systems of municipal governments – Section 19(1)(m) of the Act." (Pls.' Resp. Br. at 1). The matter is currently before the Court on Defendants' Motion to Dismiss and Defendants' Motion for Rule 11 Sanctions. The parties have briefed the issues and the Court heard oral argument on September 22, 2011. For the reasons set forth below, the Court shall GRANT Defendants' Motion to Dismiss because Plaintiffs' claims are not ripe for review. In addition, the Court shall DENY Defendants' Motion for Rule 11 Sanctions.

BACKGROUND

A.       **Procedural History**

"[T]he present action represents a focused and targeted challenge to one particular provision of the Act that applies solely to the pension funds and retirement systems of municipal governments – Section 19(1)(m) of the Act." (Pls.' Resp. Br. at 1; *see also* Compl. at ¶ 72, stating that Section 19(1)(m) of the Act is "the gravamen of this action."). Plaintiffs' Complaint for declaratory and injunctive relief asks this Court to declare Section 19(m)(1) of the Act unconstitutional and enjoin its implementation.

This action was filed by the following Plaintiffs on April 18, 2011: 1) the General Retirement System of the City of Detroit (the "GRS"); 2) the Police and Fire Retirement System of the City of Detroit (the "PFRS"); 3) Susan Glaser, the Chairperson of the Board of Trustees of the GRS; 4) Alvin Brooks, a member of the Board of Trustees of the GRS; 5) James E. Moore, the Chairperson of the Board of Trustees of the PFRS; and 6) Laura Isom, a former member of the Board of Trustees of the PFRS. The named Defendants are: 1) Richard Snyder, Michigan's current Governor; and 2) Andrew Dillon, the current Treasurer of the State of Michigan.

Plaintiffs' legal contention is that the Court should enjoin Section 19(1)(m) of the Act because, if it were to be implemented by an emergency manager appointed for the City of Detroit, that would violate Plaintiffs' rights under both the United States Constitution and the State of Michigan's Constitution. Plaintiffs allege that implementation of Section 19(m)(1) would violate: "the Contracts Clause of the United States Constitution" (Count I); "the Contracts Clause of the State of Michigan Constitution" (Count II); "the Home Rule Provision of the State of Michigan Constitution" (Count III); "the Takings Clause of the United States

Constitution" (Count IV); the "Takings Clause of the State of Michigan Constitution" (Count V); "the Due Process Clause of the United States Constitution" (Count VI); "the Due Process Clause of the State of Michigan Constitution" (Count VII); "the Equal Protection Clause of the United States Constitution" (Count VIII); "the Equal Protection Clause of the State of Michigan Constitution" (Count IX); and "the Accrued Financial Benefits Provision of the State of Michigan Constitution" (Count X).

On May 23, 2011, Defendants filed a Motion to Dismiss, pursuant to FED. R. CIV. P. 12(b)(1), (2) and (6). (Docket Entry No. 12). On June 17, 2011, Defendants filed a Motion for Rule 11 Sanctions. (Docket Entry No. 15). Both motions have been fully briefed by the parties and the Court held a hearing on September 22, 2011.

**B.    Relevant Provisions Of The Act**

The Local Government and School District Fiscal Accountability Act, Public Act 4 of 2011, M.C.L. § 151.1501 *et seq*. ("the Act"), was enacted on March 16, 2011, and took effect on that same date.

Under the Act, the "state financial authority of a local government[1] may conduct a preliminary review to determine the existence of a local government financial problem" if 1 or more of several delineated events occur. M.C.L. § 141.1512(1). Before commencing such a preliminary review, however, the "state financial authority shall give the local government specific written notification of the review." M.C.L. § 141.1512(2).

If a preliminary review is conducted, and a "finding of probable financial stress is made

---

[1]For a municipal government, the term "State financial authority" means the state treasurer. M.C.L. § 141.1505(k).

for a municipal government under subsection (2), the governor shall appoint a review team for that municipal government consisting of the state treasurer or his or her designee, the director of the department of technology, management, and budget or his or her designee, a nominee of the senate majority leader, and a nominee of the speaker of the house of representatives." M.C.L. § 141.1512(3). That review team must report its finding to the governor, generally within 60 days following the appointment of the review team. M.C.L. § 141.1513(3).

The review team "shall have full power in its review to perform" all of the following functions: a) examine the books and records of the local government; b) utilize the services of other state agencies and employees; and c) negotiate and sign a consent agreement with the chief administrative officer of the local government. M.C.L. § 141.1513(1). Such a consent agreement may provide for remedial measures considered necessary to address the local financial problem and provide for the financial stability of the local government and may include either a continuing operations plan or recovery plan. *Id.* In order for a "consent agreement to go into effect, it shall be approved, by resolution, by the governing body of the local government and shall be approved and executed by the state financial authority." M.C.L. § 141.15113(1)(c).

The Act further provides that a "consent agreement as provided in section 13(1)(C) may require a continuing operations plan or a recovery plan if required by the state financial authority." M.C.L. § 141.1514a(1). Section 14a of the Act further provides that a "consent agreement may include a grant to the chief administrative officer, the chief financial officer, the governing body, or other officers of the local government by the state treasurer" of one or more of the powers prescribed for emergency managers in section 19." M.C.L. § 141.1514a(9).

After a review team provides a report to the governor under Section 13, the governor has

4

to make one of the following determinations within 10 days after receipt of the report:

> (a) The local government is not in a condition of severe financial stress.
> (b) The local government is in a condition of severe financial stress as provided in section 14, but a consent agreement containing a plan to resolve the financial stress has been adopted under this act.
> (c) A local government financial emergency exists as provided in section 14 and no satisfactory plan exists to resolve the emergency.
> (d) The local government entered into a consent agreement containing a continuing operations plan or recovery plan to resolve a financial problem, but materially breached that consent agreement.

M.C.L. § 141.1515(1).

If the governor determines pursuant to subsection (1) that a financial emergency exists, the governor must provide the governing body and chief administrative officer of the local government with a written notification of the determination, along with "notice that the chief administrative officer or the governing body of the local government has 7 days after the date of the notification to request a hearing conducted by the state financial authority or the state financial authority's designee." M.C.L. § 141.1515(2). Following the hearing, the governor must "either confirm or revoke, in writing, the determination of the existence of a financial emergency." *Id.*

The Act further provides that, if the governor confirms the existence of a financial emergency, the local government may then file an appeal to the Ingham county circuit court. M.C.L. § 141.1515(3).

Section 15(4) provides that the governor shall appoint an emergency manager upon confirming the finding of a financial emergency:

> Upon the confirmation of a finding of a financial emergency, the governor shall declare the local government in receivership and shall appoint an emergency manager to act for and in the place of the governing body and the office of the chief administrative officer of the local government. The emergency manager

5

> shall have broad powers in receivership to rectify the financial emergency and to assure the fiscal accountability of the local government and the local government's capacity to provide or cause to be provided necessary governmental services essential to the public health, safety, and welfare. Upon the declaration of receivership and during the pendency of receivership, the governing body and the chief administrative officer of the local government may not exercise any of the powers of those offices except as may be specifically authorized in writing by the emergency manager and are subject to any conditions required by the emergency manager.

M.C.L. § 141.1515(4).

If an emergency manager is appointed, he or she may take several additional actions with respect to the local government which is in receivership, notwithstanding any charter provision to the contrary, including:

> (m) If a municipal government's pension fund is not actuarially funded at a level of 80% or more, according to the most recent governmental accounting standards board's applicable standards, at the time the most recent comprehensive annual financial report for the municipal government or its pension fund was due, the emergency manager may remove 1 or more of the serving trustees of the local pension board or, if the state treasurer appoints the emergency manager as the sole trustee of the local pension board, replace all the serving trustees of the local pension board.

M.C.L. § 141.1519(1)(m).

## LEGAL STANDARD

Defendants move to dismiss this action for lack of subject matter jurisdiction, pursuant to FED. R. CIV. P. 12(b)(1), arguing that Plaintiffs lack standing and their claims are not ripe for review by a federal court. Defendants also raise additional challenges and ask the Court to dismiss the action pursuant to FED. R. CIV. P. 12(b)(6), for failure to state a claim upon which relief can be granted. The Court, however, is "bound to consider the 12(b)(1) motion first, since the Rule 12(b)(6) challenge becomes moot if this court lacks subject matter jurisdiction." *Moir v. Greater Cleveland Regional Transit Authority*, 895 F.2d 266, 269 (6th Cir. 1990).

Where subject matter jurisdiction is challenged pursuant to FED. R. CIV. P. 12(b)(1), the plaintiff has the burden of proving jurisdiction in order to survive the motion. *Id.*

"Motions to dismiss for lack of subject matter jurisdiction fall into two general categories: facial attacks and factual attacks." *United States v. Ritchie*, 15 F.3d 592,598 (6th Cir. 1994). "A *facial* attack is a challenge to the sufficiency of the pleading itself. On such a motion, the court must take the material allegations of the petition as true and construed in the light most favorable to the non-moving party." *Id.* (emphasis in original). "A *factual* attack, on the other hand, is not a challenge to the sufficiency of the pleading's allegations, but a challenge to the factual existence of subject matter jurisdiction. On such a motion, no presumptive truthfulness applies to the factual allegations" and "the court is free to weigh the evidence and satisfy itself as to the existence of its power to hear the case." *Id.* (emphasis in original).

Here, Defendants are making a factual attack. Thus, no presumptive truthfulness applies to the allegations in the complaint and the Court is empowered to resolve factual disputes. *Id.; Moir,* 895 F.2d at 269.

## ANALYSIS

**I.     Should This Action Be Dismissed Because Plaintiffs Lack Standing And Their Claims Are Not Ripe For Review By A Federal Court?**

"Article III of the Constitution confines the federal courts to adjudicating actual 'cases' and 'controversies.' U.S. Const. art. III, § 2. The threshold question in every federal case is whether the court has the judicial power to entertain the suit." *National Rifle Assoc. of America v. Magaw*, 132 F.3d 272, 279 (6th Cir. 1997). "In an attempt to give meaning to Article III's 'case or controversy' requirement, the courts have developed a series of principles termed 'justiciability doctrines.'" *Id*. Those doctrines include both standing and ripeness.

7

"Article III standing requires a litigant to have suffered an injury-in-fact, fairly traceable to the defendant's allegedly unlawful conduct, and likely to be redressed by the requested relief." *Id*.

Plaintiffs bring this suit under the Declaratory Judgment Act, "which provides the mechanism for seeking pre-enforcement review of a statute." *Id.* Declaratory judgments are typically sought before a completed "injury-in-fact" has occurred, but must be limited to the resolution of an "actual controversy." *Id.* "The Supreme Court has explained that an actual controversy in this sense is one that is appropriate for judicial determination, stating:

> A justiciable controversy is . . . distinguished from a difference or dispute of a hypothetical or abstract character, from one that is academic or moot. The controversy must be definite and concrete, touching the legal relations of parties having adverse legal interests. It must be a real and substantial controversy admitting of specific relief through a decree of a conclusive character, *as distinguished from an opinion advising what the law would be upon a hypothetical state of facts*. Where there is such a concrete case admitting of an immediate and definitive determination of the legal rights of the parties in an adversary proceeding upon the facts alleged, the judicial function may be appropriately exercised [under the Act].

*Id*. at 280 (quoting *Aetna Life Ins. Co. v. Haworth*, 300 U.S. 227, 240-41 (1937) (emphasis added).

When seeking declaratory relief, a plaintiff "must show actual present harm or a significant probability of future harm in order to demonstrate the need for pre-enforcement review." *Id.* "To determine whether a plaintiff has standing to adjudicate an 'actual controversy,' requisite for relief under the Declaratory Judgment Act, one must ask whether the parties have 'adverse legal interests, of sufficient immediacy and reality to warrant the issuance of a declaratory judgment' even though the injury-in-fact has not yet been completed." *National*

*Rifle Assoc. of America*, 132 F.3d at 280.

The basic rationale of the ripeness doctrine is to "prevent the courts, through premature adjudication, from entangling themselves in abstract disagreements." *National Rifle Assoc. of America,* 132 F.3d at 284. "Ripeness requires that the 'injury in fact be certainly impending'" and "separates those matters that are premature because the injury is speculative and may never occur from those that are appropriate for the court's review." *Id*. at 280.

"The ripeness inquiry arises most clearly when litigants seek to enjoin the enforcement of statutes, regulations, or policies that have not yet been enforced against them." *Ammex, Inc. v. Cox*, 351 F.3d 697, 706 (6th Cir. 2003).

"A case is ripe for pre-enforcement review under the Declaratory Judgment Act only if the probability of the future event occurring is substantial and of 'sufficient immediacy and reality to warrant the issuance of a declaratory judgment.'" *National Rifle Assoc. of America,* 132 F.3d at 284.

The Sixth Circuit has instructed that ripeness requires a court to weigh several factors in deciding whether to address the issues presented for review. *Id.* First, the Court is to "pay particular attention to the likelihood that the harm alleged by plaintiffs will ever come to pass." *United Steel Workers of America, Local 2116 v. Cyclops Corp*., 860 F.2d 189, 194 (6th Cir. 1988). A second factor that should be considered is "whether the factual record of this case is sufficiently developed to produce a fair and complete hearing as to the prospective claims." *Id.* The third factor that should be considered is "the hardship that refusing to consider plaintiff's prospective claims would impose upon the parties." *Id.* at 195.

In their motion, Defendants raise both standing and ripeness challenges. "As there is no

9

obligation to favor one these justiciability doctrines over the other," the Court may address these challenges in any sequence it chooses. *Warshak v. United States*, 532 F.3d 521, 525 (6th Cir. 2008). Because the Court finds that ripeness is lacking here, the Court shall start – and end – with ripeness.

### A. The Likelihood That The Harm Alleged By Plaintiff Will Ever Come To Pass

Plaintiffs' Complaint for declaratory and injunctive relief asks this Court to declare Section 19(1)(m) of the Act unconstitutional and enjoin its implementation. Plaintiffs' legal contention is that the Court should enjoin Section 19(1)(m) of the Act because, if it were to be used by an emergency manager appointed for the City of Detroit to remove 1 or more trustees for the Plaintiff Pensions, such action would violate Plaintiffs' rights under both the United States Constitution and the State of Michigan's Constitution.

Defendants contend that "it is pure speculation" whether the harm Plaintiffs allege will ever come to pass because it is "uncertain whether an emergency financial manager will ever be appointed for the City of Detroit, and, if so, whether that manager will seek to remove the pension-fund trustees for managing an underfunded plan." (Defs.' Br. at 8). The Court agrees.

In examining this first factor, the Sixth Circuit has explained that "[i]mminence is a function of probability. And probabilities can be measured by many things, including the certainty that an event will come to pass." *Thomas More Law Ctr. v. Obama*, __ F.3d __, 2011 WL 2556039 (6th Cir. 2011). In that case, the court concluded that this first factor was met where the statute at issue required the plaintiffs to buy and maintain a minimum amount of medical insurance by the statute's effective date, which plaintiffs alleged violated their constitutional rights. The plaintiffs established that the threatened injury was certainly

impending because, barring some highly speculative developments (such as the plaintiffs leaving the country or dying before the statute's effective date), the statute would require the plaintiffs to purchase insurance on or before its effective date. Thus, no future events had to occur in order for the plaintiffs to sustain the alleged constitutional harm from the statute.

The court distinguished the case from the scenario in *McConnell*,[2] a case wherein a series of future events would have to occur in order for the plaintiffs to sustain the claimed injury and the plaintiffs therefore lacked standing. *Thomas More Law Ctr., supra, at * 6.* It noted that:

> The challenged provision would affect the *McConnell* plaintiffs only if the following things happened in an election six years later: (1) a challenger ran in the primary or election; (2) the plaintiff created an advertisement mentioning the challenger; (3) the advertisement did not identify the plaintiff by name; and (4) the broadcasters attempted to charge McConnell more than their lowest unit rate for his ads.

Like the *McDonnell* scenario discussed above, numerous future events – all of which are entirely speculative – would have to occur in order for Plaintiffs to sustain the constitutional injuries alleged in this action.

Before an emergency manager could use the powers in Section 19(1)(m) to remove 1 or more of the trustees of the Plaintiff pensions, all of the following would have to occur in the future: 1) at least one of the triggering events delineated in M.C.L. § 141.1512(1) would have to occur; 2) the State Treasurer would then have to give written notice to the City of Detroit that it will conduct a preliminary review to determine the existence of a financial problem; 3) the preliminary review would have to be conducted; 4) a finding of probable financial stress would have to be made for the City of Detroit following that preliminary review; 5) the Governor

---

[2]*McDonnell v. Federal Election Commission,* 540 U.S. 93 (2003).

11

would have to appoint a review team; 6) the review team would report its ultimate findings to the Governor; 7) after receiving the report, the Governor would have to determine that the City of Detroit is in a condition or severe financial stress and that no satisfactory plan is in place to resolve it; 8) the Governor would then have to give the City of Detroit written notice of the determination, along with notice that the City can request a hearing; 9) if the City requests a hearing, the Governor would have to confirm, in writing, the existence of a financial emergency; 10) the Governor would have to declare the City of Detroit to be in receivership and appoint an emergency manager; 11) the most recent comprehensive annual financial report for the City of Detroit or the Pension fund would have to indicate that the Pension fund is not actuarially funded at a level of 80% or more; and 12) the emergency manager would have to decide to use the powers of Section 19(1)(m).

In their Response Brief, Plaintiffs stress that the powers of Section 19(1)(m) could also come in to play if a consent agreement with the City of Detroit was reached. While that is true, all of the following would have to occur before the powers of Section 19(1)(m), granted via a consent agreement, could actually be used: 1) at least one of the triggering events delineated in M.C.L. § 141.1512(1) would have to occur; 2) the State Treasurer would then have to give written notice to the City of Detroit that it will conduct a preliminary review to determine the existence of a financial problem; 3) the preliminary review would have to be conducted; 4) a finding of probable financial stress would have to be made for the City of Detroit following that preliminary review; 5) the Governor would have to appoint a review team; 6) that review team would have to negotiate a consent agreement with the City of Detroit; 7) that agreement would have to grant the Mayor of Detroit, or another official, the powers prescribed for emergency

managers in Section 19(1); 8) the most recent comprehensive annual financial report for the City of Detroit or the Pension fund would have to indicate that the Pension fund is not actuarially funded at a level of 80% or more; and 9) the Mayor or other official granted powers under the consent agreement would have to decide to use the powers of Section 19(1)(m).

Significantly, as to both of the above routes, not even the first or second steps have actually occurred with respect to the City of Detroit.

"Ripeness requires that the 'injury in fact be certainly impending'" and "separates those matters that are premature because the injury is speculative and may never occur from those that are appropriate for the court's review." *National Rifle Assoc. of America,* 132 F.3d at 280. This case is not ripe because it involves numerous contingent future events that may never occur. (*See, e.g. Thomas v. Union Carbide Agr. Prods. Co.*, 473 U.S. 568, 580-81 (noting that a case is not ripe when it involves "'contingent future events that may not occur as anticipated, or indeed may not occur at all.'"); *United Steel Workers of America, Local 2116 v. Cyclops Corp.*, 860 F.2d at 195 (finding claims not ripe where "it is far from clear that New Boston will ever fail to meet its pension obligations."); *Boise v. Capital Area Comm. Svs.*, 188 F.3d 506, 1999 WL 618085 (6th Cir. 1999) (finding claim not ripe because "Defendants have yet to attempt to use the [challenged] release in any manner which could possibly violate the ADA or Plaintiff's constitutional rights."). In other words, the action is not ripe for review because not only have the above multi-step processes that could potentially lead to the use of the powers of Section 19(1)(m) not been *completed*, they have not even *begun*.

B.   **Whether The Factual Record Is Sufficiently Developed To Produce A Fair Adjudication Of The Merits Of The Parties' Respective Claims**

A second factor that should be considered is "whether the factual record of this case is

13

sufficiently developed to produce a fair and complete hearing as to the prospective claims." *United Steel Workers of America, Local 2116 v. Cyclops Corp.*, 860 F.2d at 194.

Defendants contend that "there is no factual record whatsoever to produce a reasoned adjudication, because no actions have yet been taken." (Defs.' Br. at 8).

The Court agrees that "the factual record is insufficiently developed at this stage to warrant judicial action." *Adult Video Assoc. v. United States Dept. of Justice*, 71 F.3d 563, 568 (6th Cir. 1995).

Aside from the fact that the Act was passed, and various individuals have expressed *opinions* as to whether or not an emergency manager may be appointed for the City of Detroit in the future, there are no facts relating to Plaintiffs' claims. No emergency manager has been appointed for the City of Detroit, and thus no emergency manager has taken any actions under the Act relating to Plaintiffs. Without further factual development, this Court could not adjudicate the claims alleged in this case.[3]

For example, Count IV asserts that the Act violates the Takings Clause of the United States Constitution. A takings analysis is an *ad hoc* and fact-intensive inquiry. *Shenango Inc. v. Apfel*, 307 F.3d 174, 182 (3rd Cir. 2002). Three factors are significant to assessing a takings claim under the Fifth Amendment to the United States Constitution: 1) the economic impact of the regulation on the claimant; 2) the extent to which the regulation interferes with reasonable investment-backed expectations; and 3) the character of the governmental action. *Id.* Because

---

[3]Notably, there are other actions challenging the constitutionality of the Act currently pending in the Eastern District of Michigan, including actions wherein an emergency manager has actually been appointed and is alleged to have taken actions involving the named plaintiffs in those actions. (*See* Case No. 11-13392 and Case No. 11-13582).

there has been no emergency manager appointed for the City of Detroit, however, and thus no emergency manager has transferred any assets of the GRS or the PFRS, or taken any other actions with respect to Plaintiffs, there are simply no facts to analyze. In other words, the above factors simply cannot be evaluated until an emergency manager has actually been appointed for the City of Detroit and has taken some kind of action involving Plaintiffs.

**C.     The Hardship To The Parties If Judicial Relief Is Denied At This Stage**

Plaintiffs argue that they will suffer significant hardship if judicial relief is denied at this stage because the Mayor of the City of Detroit has sought concessions from Plaintiffs during the past year. Plaintiffs assert that the "Boards of Trustees of each of the Detroit retirement systems have already agreed to certain concessions in response to the Mayor's demands." (Pls.' Br. at 11 n.7). Plaintiffs contend that, absent a ruling from this Court on the constitutionality of the Act, they are in a position wherein they must either: 1) negotiate or agree to further concessions with the City; or 2) face the risk that an emergency manager will be appointed for the City, which could result in undesired actions taken involving Plaintiffs.

In essence, Plaintiffs[4] desire an advisory ruling by this Court as to the constitutionality of the Act, before any emergency manager is appointed for the City of Detroit, to eliminate that uncertainty and guide their position in negotiations with the City.

---

[4] Plaintiffs further assert that "Defendants themselves would benefit from guidance at this juncture so that they can have certainty as to whether Section 19(1)(m) is valid and enforceable before they take steps to assert control over any municipal pension funds." (Pls.' Br. at 14 n.8). While Defendants might also *desire* an advisory ruling as to the constitutionality of the Act, the case or controversy requirement "prohibits all advisory opinions," including advisory opinions on matters of private or public interest. *Fialka-Feldman v. Oakland University Bd. of Trustees*, 639 F.3d 711, 715 (6th Cir. 2011).

15

The fact that Plaintiffs face uncertainty absent a ruling, however, does not equate to undue hardship. *See e.g., Adult Video Assoc. v. United States Dept. of Justice*, 71 F.3d 563, 568 (6th Cir. 1995). Without the requested ruling, Plaintiffs, like all parties who could potentially be impacted by the appointment of an emergency manager under the Act in the future, will be forced to "weigh the risks and benefits" of their situation and act accordingly.

Having weighed the above factors, this Court concludes that Plaintiffs' claims are not ripe for review and the Court shall dismiss this action.[5]

## II.   Should This Court Impose Rule 11 Sanctions?

On June 17, 2011, Defendants filed[6] a motion asking this Court to impose sanctions on Plaintiffs, and on Plaintiffs' counsel, pursuant to FED. R. CIV. P. 11.

"Federal Rule of Civil Procedure 11(b) sets certain requirements for representations to the court, including that '[b]y presenting to the court a pleading, written motion, or other paper,' 'an attorney or unrepresented party certifies that' he or she has undertaken 'an inquiry reasonable under the circumstances' to ensure that (1) 'it is not being presented for any improper purpose'; (2) 'the claims, defenses, and other legal contentions are warranted by existing law or by a nonfrivolous argument for extending, modifying, or reversing existing law or for establishing new law'; (3) 'the factual contentions have evidentiary support or, if specifically so identified, will likely have evidentiary support after a reasonable opportunity for further

---

[5]Given this ruling, the Court need not address Defendants' additional or alternative arguments in support of their Motion to Dismiss.

[6]It is undisputed that Defendants complied with Rule 11's "safe harbor" provision by serving the motion more than 21 days prior to filing their motion. (*See* FED. R. CIV. P. 11(c)(2); Defs.' Motion at ¶ 13; Pls.' Response at ¶ 13).

16

investigation or discovery'; and (4) 'the denials of factual contentions are warranted on the evidence or, if specifically so identified, are reasonably based on belief or a lack of information.'" *Indah v. United States Securities and Exchange Comm.*, __ F.3d __, 2011 WL 3890226 at *9 (6th Cir. Sept. 6, 2011) (quoting FED. R. CIV. P. 11(b)(1)-(4)).

"The identification of the specific conduct that is allegedly sanctionable is critical to a finding of a Rule 11 violation. Where a motion for sanctions is made, it 'must describe the specific conduct that allegedly violates Rule 11(b).'" *Id.* (quoting FED. R. CIV. P. 11(c)(2)).

Here, Plaintiffs' filing of this action is the specific conduct that Defendants believe constitutes a Rule 11 violation. While the motion does not specify the subsection or subsections of Rule 11(b) that Defendants contend Plaintiffs have violated, it appears that Defendants contend that subsections (1) and (2) have been violated.

### A. Alleged Violation Of Rule 11(b)(1)

Defendants appear to ask the Court to impose sanctions upon Plaintiffs, and their counsel, for violating FED. R. CIV. P. 11(b)(1), for needlessly increasing the cost of litigation, arguing:

> There is a transparent reason why Plaintiffs chose to file a premature lawsuit that may never have to be litigated: under Section 25(2) of the new Act, the Attorney General is charged with defending any claim challenging the Act's validity, and under section 25(3), the Attorney General's litigation costs "shall be at the expense of the local government that is subject to that receivership and shall be reimbursed to the attorney general by the local government." In other words, if Plaintiffs had waited until an actual controversy developed, the City of Detroit would be responsible for the State's costs in defending against the litigation. By filing prematurely, Plaintiffs hope to shift that burden to the State.

(Defs.' Br. in support of Motion for Sanctions at 2).

In response, Plaintiffs state that whether the costs of defending this action are paid by the

17

State or by the City of Detroit was "of absolutely no concern to Plaintiffs when the complaint was filed – instead, Plaintiffs were and are concerned solely with defending their rights . . ." (Pls.' Response Br. at 6).

The Court agrees with Plaintiffs that this accusation is baseless. It is unclear whether Plaintiffs or their attorneys were even aware of this issue when they filed the complaint. There is no reason to believe that Plaintiffs filed this action in order to saddle the State, rather than the City of Detroit, with the costs of defending this action.

### B. Alleged Violation Of Rule 11(b)(2)

Defendants also appear to ask the Court to impose sanctions upon Plaintiffs' counsel for violating FED. R. CIV. P. 11(b)(2).[7] An attorney violates Rule 11(b)(2) by "presenting to the court a pleading" certifying that to "the best of the person's knowledge, information and belief, formed after an inquiry reasonable under the circumstances" the "claims, defenses, and other legal contentions are warranted by existing law or by a nonfrivolous argument for extending, modifying, or reversing existing law or for establishing new law."

"[I]n this circuit, the test for the imposition of Rule 11 sanctions is whether the individual attorney's conduct was reasonable under the circumstances." *Mann v. G & G Mfg., Inc.*, 900 F.2d 953, 958 (6th Cir. 1990). A district court exercises wide discretion in determining whether an attorney's conduct was unreasonable, thereby justifying an award of sanctions under Rule 11. *Ridder v. City of Springfield*, 109 F.3d 288, 293 (6th Cir. 1997); *Runfola & Assocs., Inc. v. Spectrum II, Inc.*, 88 F.3d 368, 372 (6th Cir. 1996).

---

[7]Pursuant to FED. R. CIV. P. 11(c)(5), the Court may not impose monetary sanctions on Plaintiffs (represented parties) for a violation of Rule 11(b)(2).

Defendants contend that Plaintiffs' counsel should be sanctioned under Rule 11(b)(2) because they filed this action prematurely, before the claims were ripe for decision by the Court.

As stated above, Plaintiffs argue that their claims are ripe because they are suffering a hardship because the Mayor of the City of Detroit has sought concessions from Plaintiffs during the past year and, absent a ruling from this Court on the constitutionality of the Act, they are in a position wherein they must either: 1) negotiate or agree to further concessions with the City; or 2) face the risk that an emergency manager will be appointed for the City, which could result in undesired actions taken against Plaintiffs. While this Court finds Plaintiffs' arguments unpersuasive, and is dismissing Plaintiffs' claims as not ripe for review by this Court, this Court does not conclude that Plaintiffs' arguments are either frivolous or so baseless as to warrant the imposition of sanctions under Rule 11. Thus, the Court shall deny Defendants' Motion for Rule 11 Sanctions.

## CONCLUSION & ORDER

For the reasons set forth above, IT IS ORDERED that Defendants' Motion to Dismiss is GRANTED. IT IS FURTHER ORDERED that Defendants' Motion for Rule 11 Sanctions is DENIED.

IT IS SO ORDERED.

S/Sean F. Cox
Sean F. Cox
United States District Judge

Dated: September 29, 2011

I hereby certify that a copy of the foregoing document was served upon counsel of record on

September 29, 2011, by electronic and/or ordinary mail.

          S/Jennifer Hernandez
          Case Manager